**Billie Bryan MACKEY, Plaintiff,**

v.

**Donna SHALALA, Secretary, Department of Health and Human Services, Defendant.**

**No. Civ.A. AW–97–324.**

United States District Court,
D. Maryland,
Southern Division.

April 26, 1999.

---

John F. Karl, McDonald and Karl, Washington, DC, for plaintiff.

Lynn A. Battaglia, United States Attorney, A. David Copperthite, Assistant United States Attorney, Baltimore, MD, for defendant.

### MEMORANDUM OPINION

WILLIAMS, District Judge.

Pending before the Court are Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and Plaintiff's Cross–Motion for Partial Summary Judgment. Each party has opposed the other's respective motion, and replied accordingly. No hearing is deemed necessary. Local Rule 105.6 (D.Md.). For the reasons that follow, the Court will deny Defendant's motion in part, and grant it in part, and deny Plaintiff's motion.

### BACKGROUND

From 1980 to 1984, Plaintiff, Billie Bryan Mackey, had been the Director of the National Digestive Diseases Education and Information Clearinghouse (hereinafter the "Clearinghouse"), a GS–13 grade level position, at the National Institutes of Health ("NIH") in Bethesda, Maryland. The Clearinghouse is an arm of the Division of Digestive Diseases that provides research information to health care providers and organizations interested in the digestive diseases field. As director, Mackey worked with outside contractors, served as a liaison between the Clearinghouse and various digestive diseases committees, and chaired meetings of Clearinghouse advisors. From the time she began working at NIH in 1966, and prior to her appointment as director of the Clearinghouse, Mackey had worked in other assignments dealing with scientific communications. Then, in February of 1984, Mackey received a memorandum from Dr. Harold Roth, Director of the Division of Digestive Services, informing her that Dr. Ralph Bain was named as her immediate supervisor, and she would thereafter report to him. Mackey, however, would later learn that Bain was not only appointed as her supervisor, but he also would assume most of her responsibilities as director.

Dr. Ralph Bain began his employment at NIH in 1982 as a special expert, a non-federal position created pursuant to the Intergovernmental Personnel Act, 42 U.S.C. § 4701 et seq. This position was originally designated as a two-year appointment in which Bain acted as Executive Director of the National Digestive Diseases Advisory Board.[1] Apparently, members of the Division of Digestive Diseases, including Roth, and Earl Laurence, Executive Director of the National Institute of Arthritis, Diabetes, and Digestive and Kidney Diseases, were impressed by Bain's work and credentials and sought to have him hired as a permanent federal employee. However, because of Bain's status as a short-term, temporary non-federal employee, a special request had to be made for his conversion.

NIH guidelines provide that the conversion of special experts to competitive Civil Service, or permanent federal employee, positions are subject to the Office of Personnel Management ("OPM") certification requirements and NIH review and clearance procedures. See Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 25, excerpt from NIH Manual, 2300–304–1(L)(1) at 8. These procedures require the agency that is seeking to convert a special expert to answer a series of comprehensive questions concerning the candidate, the agency's recruitment efforts, and the nature of the position sought. Id., Ex. 28. OPM and NIH believe that these procedures are necessary in ensuring that its employment system, particularly with

---

1. Prior to coming to NIH, Bain was chairman of the chemistry department at an Illinois university.

regard to conversion cases, adheres strictly to the merit principle and provides for fair and open competition for vacancies. *Id.*

Thus, when Roth and Laurence sought to convert Bain to the permanent position of Health Scientist Administrator, they were required to follow both the NIH and OPM procedures.[2] As such, Defendant alleges that in accordance with procedure, the position was advertised from February 21, 1994 to February 28, 1994. Defendant further maintains that eight candidates applied for the position, but Bain was ultimately selected. Mackey, however, never applied for the position.

Once selected, Laurence filed the necessary paperwork with the Assistant Director of Operations for NIH's Department of Personnel Management ("DPM"), Helen Stafford, to convert Bain from the position of special expert to Health Scientist Administrator. However, Stafford denied the request because the position, as created and described by Laurence, involved short-term duties, which was considered inappropriate for a permanent civil service placement. *Id.*, Ex. 12. She further noted that unless it could be shown that the Health Scientist Administrator position was of "a continuing nature necessitating a competitive appointment," a conversion would not be considered. *Id.*

In response to the denied request, Laurence created another position for Bain. This position, Program Director for Scien-

tific Program Evaluation, was of a continuing and permanent nature, and was to be served in the Division of Digestive Diseases. In addition, a significant portion of the duties of the newly created position were already being performed by Mackey as director of the Clearinghouse.

However, unlike in the first instance, the position for Program Director for Scientific Program Evaluation was never advertised and no efforts were made to recruit candidates other than Bain.[3] In spite of this fact, the paperwork for the new position that was submitted for DPM's approval indicated that it was advertised and that eight candidates were considered.[4] Nonetheless, the position of Program Director for Scientific Program Evaluation and the request to convert Bain to a permanent federal employee were approved.

With Bain in his new position, Mackey was stripped of her previous responsibilities of working with outside contractors, serving as a liaison between the Clearinghouse and the other digestive diseases committees, and chairing meetings of Clearinghouse advisors. Dismayed, Mackey filed an administrative complaint with a Department of Health and Human Services Equal Employment Opportunity ("EEO") counselor on June 25, 1984. *See id.*, Ex. 39. Therein, she alleged that Bain's appointment as her supervisor was in violation of NIH and OPM procedures with regard to special experts being converted to permanent employee status.[5]

---

**2.** It appears from the record that this position, Health Scientist Administrator for the Division of Digestive Diseases, was created by Laurence specially for Bain. *See* Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 13.

**3.** There is a genuine dispute with regard to whether the second position was advertised. Defendant has provided no evidence that conclusively shows that the position was in fact advertised. Mackey, on the other hand, claims that it was not. As this issue was raised by Defendant in its motion for summary judgment, the Court will view the facts in the light most favorable to Mackey, and

consider the position to not have been advertised.

**4.** It appears from the record that the same information, e.g. position description, candidates considered, recruitment efforts, etc., used to certify the first position was also used for the second. *Compare* Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 10 and Ex. 15.

**5.** Mackey's allegations of violations of NIH and OPM procedures appear to be based on, *inter alia*, section 1–3(b) of the Federal Personnel Manual, which reads:

The improper employment of experts and consultants is not only illegal, it is wasteful

*Id.; see also id.,* Ex. 26. She further claimed that she was more qualified than Bain, despite the fact that she had a master's degree and he a doctorate, for the position of Clearinghouse director because of her expertise in education and information retrieval, as well as her knowledge of digestive diseases. *Id.* Mackey also complained that she was relieved of her duties and responsibilities in contravention of her position description as director of the Clearinghouse.

Although Mackey's complaints were filed with the EEO counselor, she alleged very little in the way of actual gender-based discrimination. In fact, the EEO counselor's report is scant with regard to any allegations of intentional discriminatory conduct. The most substantive of the allegations are that Roth, at times, conducted informal meetings in the men's restroom, thereby preventing her participation, and that Roth had difficulty in relating to women in managerial positions. *Id.* Mackey did not provide the EEO counselor with any other specific instances of discrimination, other than her assertion that Bain's appointment as her supervisor constituted gender discrimination in that it was "taken to the detriment of a woman (herself) for the benefit of a man (Dr. Bain)." *Id.*

Then, in January of 1985, Plaintiff filed a second complaint with the EEO counselor. *See id.,* Ex. 40. This time, Mackey alleged that after Bain was made her supervisor she was denied an opportunity to chair a meeting of advisors to the Clearinghouse, she had to submit all of her written communications to Bain for approval, that she was given difficult assignments with short turn around times, and that she was de-

nied a pay increase. *Id.* Mackey characterized all of these allegations as being gender-based discrimination and retaliatory for her filing the first EEO complaint. *Id.*

On February 21, 1985, Mackey was informed that she was being reassigned to the Division of Extramural Activities ("DEA") effective February 25, 1985. Perceiving her reassignment as another example of gender discrimination, Mackey brought it to the attention of the EEO counselor in her third complaint filed in February of 1985. *See id.,* Ex. 34. While most of the allegations in this complaint were either the same as, or similar to, those described in the previous complaints, Mackey did cite her recent reassignment as evidence of discriminatory conduct and retaliation for her filing the previous complaints. *Id.*

Mackey continued to file complaints with the EEO alleging gender discrimination and retaliation, and grievances with NIH. Then, in 1989 her discrimination claims were consolidated and heard before an EEOC administrative law judge ("ALJ"). The ALJ recommended that the agency find that no discrimination had occurred. The EEOC adopted the ALJ's recommendation, and issued Mackey a right-to-sue letter. Mackey subsequently filed an action in the U.S. District Court for the District of Columbia.

On the Defendant's Motion to Dismiss All Claims Except Those Based on Title VII or, in the Alternative, for Summary Judgment, and to Transfer Plaintiff's Title VII Claims, the D.C. District Court dismissed Counts III through V, leaving only the Title VII claims.[6] *See Mackey v. Sul-*

and destroys the morale of the career specialists. Examples of improper employment of an expert or consultant are to: give a particular person temporary or intermittent appointment solely in anticipation of a career-conditional appointment, do a job that can be done as well by regular employees, do a full-time continuous job, avoid competitive employment procedures, or avoid General Schedule pay limits.

Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 5, excerpt from Federal Personnel Manual (January 22, 1982), § 1–3(b).

6. The district court dismissed all of Mackey's claims alleging violations of OPM and NIH personnel policies.

*livan*, No. 90–0007, 1991 WL 128510 (D.D.C. filed Mar. 28, 1991). The court also granted Defendant's motion to transfer the case to the District of Maryland on the grounds that the District of Columbia was an inappropriate venue. *See id.; see also* 42 U.S.C. § 2000e–5(f)(3) (Title VII venue statute). Now, pending before this Court are Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and Plaintiff's Cross–Motion for Partial Summary Judgment. The Court will address the substance of each motion below.

## DISCUSSION

### 1. Standard of Review on Summary Judgment

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir.1997) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505).

To defeat a motion for summary judgment, the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. However, when a court is confronted with cross-motions for summary judgment, it must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2720 (1983). Thus, in determining whether genuine and material factual disputes exist, the Court has considered the parties' respective memorandums and the many exhibits attached thereto, and construed all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[7]

### II. Gender Discrimination

■ The original objective of Congress in enacting Title VII of the Civil Rights Act was to achieve equality in employment opportunities through the eradication of discriminatory barriers. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("The language of Title VII makes plain the purpose of Congress to ensure equality of employment opportunities and to eliminate those discriminatory practices and devices...."). Congress, however, "did not enact Title VII as a panacea for every setback that members of

7. As for Defendant's motion to dismiss, because the opposing parties have both submitted evidence outside the complaint which the Court has considered, the motion will be treated as one for summary judgment. *See* Fed.R.Civ.P. 12(b) (stating that a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is to be converted into a motion for summary judgment whenever matters outside the pleading are presented to and accepted by the court); *see also Jacobson v. AEG Capital Corp.*, 50 F.3d 1493 (9th Cir.1995). Accordingly, Defendant's motion to dismiss will be denied as moot.

a protected class suffers in their place of employment." *Riley v. Technical and Management Services Corp., Inc.,* 872 F.Supp. 1454, 1460 (D.Md.1995). Thus, there must be some proof of intentional discrimination in order for a claim to lie. The plaintiff cannot simply point to an adverse employment action and declare that it was in violation of Title VII solely because she is a member of a protected class. Instead, the plaintiff must establish that the adverse employment decision would not have been made "but for" for her protected class status. *See McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

Here, Mackey's charges of being deprived an opportunity to apply for certain positions, having her responsibilities as director of the Clearinghouse taken away, and being denied a promotion, all because of her gender, essentially boil down to a claim of discriminatory failure to promote and disparate treatment under Title VII. As such, Mackey must proceed in establishing that these alleged employment actions were motivated by discriminatory animus. Thus, to meet her burden on summary judgment, Mackey can offer direct or circumstantial evidence, or utilize the proof scheme set forth in *McDonnell Douglas Corp. v. Green.*

"To satisfy ordinary principles of proof, [Mackey] must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact." *Evans v. Technologies Applications & Service Co.,* 80 F.3d 954, 959 (4th Cir.1996) (citing *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988)). The record here provides very little, if any, direct or indirect evidence of discriminatory conduct undertaken by the Defendant. As mentioned, Mackey has alleged that Roth, at times, conducted informal meetings in the men's restroom, and has difficulty relating to women in managerial positions. However, these bald allegations and unsub-stantiated assertions cannot, without more, establish a prima facie case of gender discrimination. *See Evans,* 80 F.3d at 959. As such, Mackey will have to resort to the *McDonnell Douglas* proof scheme to satisfy her burden.

■ Since Mackey can only rely upon circumstantial evidence to prove that an illicit criterion motivated her employer to take the alleged adverse employment actions, its failure to promote, she must prove that (1) she is a member of a protected class; (2) her employer had an open position for which she applied or sought to apply; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Evans,* 80 F.3d at 959; *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir. 1994). Once proven, an inference of discrimination is raised which Defendant may rebut with evidence of a legitimate, nondiscriminatory reason for its actions. *Evans,* 80 F.3d at 959; *Carter,* 33 F.3d at 459. If the Defendant succeeds, the inference of discrimination drops from the case, *id.,* and Mackey must then demonstrate that the reason advanced by Defendant is pretextual and in fact motivated by discriminatory intent. *Vaughan v. Metrahealth Companies, Inc.,* 145 F.3d 197, 202 (4th Cir.1998).

It is clear that Mackey satisfies the first element as a woman. As for the remaining elements, the facts are not as clear cut. With regard to the second element, when the position for Health Scientist Administrator was allegedly advertised, Mackey did not apply. Then when the second position, Program Director for Scientific Program Evaluation, was created, Mackey claims that it was not advertised. Taking these facts in the light most favorable to Mackey, it appears that she would not be able to establish that her employer had an open position for which she applied or sought to apply. However, "the burden of

establishing a prima facie case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Thus, the Court will assume that had the second position been advertised, Mackey would have applied.

This brings the Court to the third and fourth element. The records suggests that Mackey was a qualified candidate, albeit, in Defendant's view, not the most qualified.[8] However, as for the fourth element, the Court has serious doubts about whether it has been satisfied. While the Court may be willing to allow Mackey the inference that had the position been advertised she would have applied, it seems somewhat of a stretch to then infer that she was rejected for the position. Although establishing a prima facie case has been characterized · as a "relatively easy test," *see Young v. Lehman,* 748 F.2d 194, 197 (4th Cir.1984), the Court does not believe that it allows for the piling of inference upon inference to satisfy its elements.

■ Nonetheless, Defendant has articulated a legitimate, non-discriminatory reason for selecting Bain instead of Mackey. First, the position required that the candidate have, among other things, experience with biomedical research programs, a broad scientific background with administrative and management experience, experience in working with scientists and lay persons, an ability to plan and evaluate programs, an understanding of the federal research grant process, and experience in planning and conducting scientific conferences and meetings. Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 46. The evidence also shows that recognition for scientific accomplishment, and invitations to speak or present papers before a scientific organization would be considered in evaluating the candidate's qualifications. Further, Laurence suggested that he felt that a scientist would be the best qualified candidate for the position. *See* Def's Mtn. for S.J., Laurence Depo., Ex. 2 at 199.

Accordingly, Defendant claims that it ·chose Bain for the position because of his exceptional qualifications. Bain holds a Ph.D. in chemistry, he acted as chairman of the chemistry department at an Illinois university, he served as a principal investigator on an NIH grant, was awarded a nationally-recognized fellowship by the American Council on Education, and published several articles. Conversely, Mackey has an undergraduate degree in biology, and a master's degree in educational psychology. While she had worked for NIH since 1966, and had extensive experience in scientific communications, Mackey is not a scientist, and does not appear to have a specialized knowledge of multiple scientific disciplines.

Despite Mackey's claim that her qualifications are superior to that of Bain, Defendant "has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria." *Wileman v. Frank,* 979 F.2d 30, 38 (4th Cir.1992) (citation omitted); *see also Beall v. Abbott Labs.,* 130 F.3d 614, 620 (4th Cir.1997) (" '[i]t is the perception of the decision maker which is relevant' not the self-assessment of the plaintiff.") (quoting *Evans,* 80 F.3d at 960–61). ·As such, even if Mackey's qualifications were equal to that of Bain's, Defendant's decision to select Bain is not discriminatory, unless it is shown that the decision was based on proscribed criteria. Thus, Mackey must demonstrate that the reason advanced by Defendant is pretextual and in fact motivated by discriminatory intent. *Vaughan,*

---

8. Defendant insists that the position required the candidate to have a Ph.D. degree, and since Mackey only held a master's degree, she was not qualified for the position. However, the rating criteria that was used to rate the applicants for the position states that a candidate with a "Ph.D. degree (or equivalent) in a health or physical science field plus moderate agency-related training" or a "Ph.D. degree or M.S. degree with substantial agency-related training" would be considered. Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 46.

145 F.3d at 202. This will require her to show that the reason she was not promoted was because of her sex, and not her qualifications. *See Evans,* 80 F.3d at 960. The Court, however, does not sit as a "super-personnel department determining, without regard to [Defendant's] ability to assess the full dimension of its employees' qualifications and its ability to view its employees in a work environment, whether its perception of an employee's qualifications is erroneous." *Evans v. Technologies Applications & Services Co.,* 875 F.Supp. 1115, 1120 (D.Md.1995). Thus, to show pretext, Mackey must show discrimination.

Mackey has failed to present any proof that Defendant's explanation is pretextual and that she is the victim of intentional discrimination. She simply asserts that Defendant's explanation is not worthy of any credence because the hiring of Bain was in violation of established OPM and NIH policies and procedures. Her arguments, however, are unpersuasive.

From the outset, this case sounded more so of an employee grievance, than gender discrimination. The essence of Mackey's EEO complaints, the pleadings filed in the instant action, and her arguments made on summary judgment, all involve her dissatisfaction with the circumstances surrounding the way in which Bain was hired, and the apparent circumvention of NIH's hiring and promotion procedures. This, coupled with the absence of any proof of intentional discrimination, cannot sustain an action for gender discrimination under Title VII. *See Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.1987) (stating that it is not necessarily pretext for discrimination if the "employer is trying to hide some other offense, such as a violation of a civil service system or collective bargaining agreement."). Mackey

must bear in mind that "Title VII does not compel every employer to have a good reason for its deeds; it is not a civil service statute." *E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1321 (10th Cir.1992) (quoting *Benzies v. Illinois Dep't of Mental Health & Developmental Disabilities,* 810 F.2d 146, 148 (7th Cir.1987)).

Beyond Mackey's failure to offer any evidence of intentional discrimination, the record supports Defendant's position that the decision to hire Bain was not based on illegal criteria. For instance, when the Health Scientist Administrator position was advertised, eight people applied. Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 10. Of those eight, one was female, and one a minority male. *Id.* When Bain was selected for the position, seven men and one woman, or seven white candidates and one minority, were denied. Under these facts, it is difficult to perceive any discriminatory intent on the part of Defendant, particularly when both male and female candidates were considered, but not selected. A discriminatory motive, cannot, as a matter of law, be invariably inferred from alleged violations of NIH's hiring policies. *See e.g. Holder v. City of Raleigh,* 867 F.2d 823, 826 (4th Cir.1989). Accordingly, the Court finds that Mackey has failed to demonstrate a genuine dispute of material fact with regard to her charge of gender discrimination for her being denied a promotion to the position of Program Director for Scientific Program Evaluation.[9]

In light of the Court's findings, Mackey also cannot maintain a claim premised on her allegations that she was denied an opportunity to chair a meeting of advisors to the Clearinghouse, that she had to submit all of her written communications to Bain for approval, that she was given diffi-

---

**9.** Defendant also argues that Mackey has failed to timely exhaust her administrative remedies within the statutory requisite thirty day period. *See* 29 C.F.R. § 1613.214(a)(1)(i) (1990). However, the record shows that she first sought EEO counseling on June 25, 1984. *This was eleven days after she received the memo from Roth that Bain was being appointed her supervisor. See* Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Ex. 39. Thus, Mackey has timely exhausted her administrative remedies.

cult assignments with short turn around times, and that she was denied a pay increase. These allegations are merely endemic to an employee who reports to a supervisor. Once Bain's appointment as her superior was held to be non-discriminatory, the indirect effect that this new position had on Mackey's responsibilities and authority must also be considered discrimination free.

## III. *Retaliation*

▇ To establish a prima facie claim of retaliation in violation of Title VII, a plaintiff must show that (1) she engaged in protected activity; (2) the defendant took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 258 (4th Cir.1998). The defendant may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action, *Munday v. Waste Management of North America, Inc.,* 126 F.3d 239, 242 (4th Cir.1997), after which the burden shifts back to the plaintiff to show that those reasons are pretextual. *Id.*

Defendant argues that Mackey's retaliation claim must be dismissed because she failed to allege that she suffered an adverse employment action as a result of her protected activity. In particular, Defendant claims that her reassignment to the Division of the Extramural Programs in February of 1985 did not constitute an "adverse employment action" because it did not involve an "ultimate decision," such as hiring, granting leave, discharging, promoting, or compensating.

The Fourth Circuit, in defining what constitutes an adverse employment action, has "consistently focused on the question of whether there has been discrimination in what could be characterized as ultimate employment decisions, such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981). Defendant claims that this interpretation of an adverse employment action would preclude a reassignment and transfer because they are only mediate actions. However, the Fourth Circuit has not specifically addressed whether a reassignment can be considered an adverse employment action. *But see DiMeglio v. Haines,* 45 F.3d 790, 804 & n. 6 (4th Cir.1995) (a reprimand and reassignment *may* constitute an adverse employment action.). Thus, the Court has looked to other circuits for guidance.

What the Court has found most persuasive is the line of decisions that have defined an adverse employment action as a "materially adverse change in the terms and conditions of employment" that might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Crady v. Liberty National Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993). The courts deciding these cases have held that a transfer or reassignment moving a plaintiff from an "elite" position with opportunity for advancement to a less prestigious position with little opportunity for professional growth is sufficiently adverse to satisfy the second prong of the plaintiff's prima facie case of retaliation. *See de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 21 (2d Cir.1996); *Jacobs v. Martin Sweets Co.,* 550 F.2d 364–69 & n. 9 (6th Cir.1977) (holding that even though job transfer involved "no change in hours and no reduction in salary" and plaintiff "had not at all times been diligent and punctual in attendance" transfer from position as executive secretary to senior vice president to "just a clerical position" in the purchasing department was adverse job action.). These courts have recognized that Title VII does not limit an adverse employment action to a decision that only affects monetary consid-

erations, since an employer can make an employee's job undesirable or unbearable without affecting that employee's salary or benefits. *See e.g. Torre v. Casio.*, 42 F.3d 825, 831 n. 7 (3d Cir.1994) (transfer to a "dead-end job" would be an adverse employment action); *Collins v. Illinois*, 830 F.2d 692, 702–04 (7th Cir.1987) (lateral transfer involving same pay and benefits but change in responsibilities held to be an adverse employment action); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir.1987) (transfer to different job in different department with no reduction in salary but lower grade and denial of application for another job in same department).

However, those courts that have interpreted the scope of "adverse employment actions" more broadly have generally held that a purely lateral transfer, one that does not involve a demotion in form or substance, or a transfer involving no more than a minor change in working conditions, cannot rise to the level of a materially adverse employment action. *See Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996) (Posner, J.). These limits are intended to prevent "every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like" from forming the basis of a discrimination suit. *Id.*

Here, Mackey claims not only that her reassignment to the DEA was retaliatory, but was to a "career dead-end" position that does not have any promotion potential. In support of her contention, Mackey has directed the Court to the testimony of Dr. Walter Stolz, Director of the DEA, who explained that when he received word, via a telephone call, that Mackey was to be reassigned to his division he was not given any specifics regarding what her new duties and responsibilities would be. Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Stolz Depo., Ex. 31 at 11–

12. Essentially, Stolz stated that he was told "[y]ou've got this employee, find something for her to do." *Id.* at 13; *see also id.*, Ex. 33 (Mackey's Notification of Personnel Action of her Reassignment which describes her new position title as "Unclassified Duties"). Moreover, Stolz testified that at the time she was reassigned, there was not even a position available for her to fill in her then current capacity as a GS–13 Technical Information Specialist. Stolz stated that he had to "think of things that [he] needed to be done" in order to find work for Mackey and keep her busy. *Id.* at 12. Eventually, Mackey was given a series of assignments that included drafting minutes for meetings, performing evaluations of the success of various grants or contract programs, updating catalogs, and creating an Intranet for employees within the division.[10] *Id.* at 16–19. Although she was not demoted grade-wise, Mackey claims that these duties are low-level functions that are more appropriate for a GS–7, GS–8, and GS–9 grade level employee, rather than a GS–13 like herself.

In light of this evidence, the Court believes that Mackey can make out a prima facie case for retaliation under Title VII. First, it is undisputed the she engaged in protected activity when she lodged her series of complaints with the EEO counselor. Second, the reassignment to the DEA that entailed a substantial change in her job duties and responsibilities constituted an adverse employment action. Third, there is sufficient evidence in the record to raise more than an inference the a causal connection existed between the protected activity and the adverse action. Thus, Mackey is entitled to an inference of discrimination, *see Munday*, 126 F.3d at 242, which Defendant may rebut by showing that there was a legitimate, non-discriminatory reason for the adverse action. *Id.*

**10.** Interestingly, when Stolz was asked to explain Mackey's duties he characterized some as "small things," and others as "not a big deal." Pl's Cross–Mtn. for Partial S.J. and Opp. to Def's S.J. Mtn., Stolz Depo., Ex. 31 at 16–18.

Here, Defendant has attempted to articulate a legitimate, non-discriminatory reason for Mackey's transfer to the DEA. *See Munday,* 126 F.3d at 242. Defendant claims that in 1985, NIH and the Clearinghouse experienced a reorganization that resulted in several employees being transferred to other divisions. Defendant cites the testimony of Laurence in support of its contention that Mackey was one of the employees affected by this reorganization. However, Laurence never testified to this effect. When asked if he remembered why he transferred Mackey to the DEA, Laurence stated generally that "we transferred the clearinghouses to our Public Information Office," but never stated that Mackey was one of those individuals affected by the reorganization. Def's Mtn. for S.J., Laurence Depo., Ex. 2 at 29. In fact, Laurence testified that he "did not remember the time frame in which Ms. Mackey was transferred from the clearinghouse." *Id.*

■ While the Defendant does not have the burden to persuade the Court that it was actually motivated by the proffered reasons, it must, however, produce enough admissible evidence to raise a genuine issue of fact as to whether it discriminated against Mackey. *See Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089; *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). The only evidence that Defendant has produced is the testimony of Laurence, which the Court believes is not legally sufficient to justify a judgment for Defendant. *See id.* Furthermore, the initial Notification of Personnel Action for Mackey's reassignment does not indicate that she was being transferred as a result of some reorganization. In fact, the only basis or explanation that is provided on the Notification for the reassignment is the general authority given to department heads, pursuant to 5 U.S.C. § 3341, to temporarily "detail employees among the bureaus and offices of his department." [11] 5 U.S.C. § 3341. Accordingly, the Court believes that Defendant has failed to produce sufficient admissible evidence that its proffered reason was legitimate and non-discriminatory. Thus, a genuine dispute of material fact exists with regard to Mackey's claim of retaliation.

### IV. *Conclusion*

In accordance with the Court's findings, Defendant's motion for summary judgment will be granted with regard to the Title VII claim of gender discrimination, and denied as to the Title VII claim of retaliation. Plaintiff's cross-motion for partial summary judgment will be denied as to the request for entry of judgment on the claim of gender discrimination, and entry of judgment, as a matter of law, on the claim of retaliation. As for Plaintiff's request for judgment that "the hiring of Mr. Bain violated the Federal Equal Opportunity Recruitment Program," the provision of the Civil Service Reform Act, 5 U.S.C. § 7201(c)(1), providing for the establishment of minority recruitment programs within federal agencies does not give rise to a private cause of action. *Scipio v. Weinberger,* 622 F.Supp. 47, 48 (N.D.Ill. 1985). Finally, as for Plaintiff's request for partial summary judgment with regard to the grievances she filed pertaining to violations of OPM and NIH hiring policies, the U.S. District Court for the District of Columbia dismissed these charges in its March 28, 1991 Memorandum Opinion and Order, and therefore they may not be relitigated again here. A separate Order consistent with this Opinion will follow.

---

11. 5 U.S.C. § 3341 (1970) provides in part:
   (a) the head of an Executive department ... may detail employees among the bureaus and offices of his department?27
   (b) Details under subsection (a) of this section ... may be for not more than 120 days.

These details may be renewed by written order of the head of the department, in each particular case, for periods not exceeding 120 days.